**Maya BOYETTE, et al., Plaintiffs**

v.

**William F. GALVIN, in his Capacity as Secretary of the Commonwealth of Massachusetts, et al., Defendants**

**No. CIV.A. 98–10377–GAO.**

United States District Court,
D. Massachusetts.

March 31, 2004.

---

238

Derek L. Gaubatz, Anthony R. Picarello, Jr., Roman P. Storzer, The Becket Fund for Religious Liberty, Washington, DC, Michael J. Meagher, Robert J. O'Regan, Burns & Levinson LLP, Boston, MA, for plaintiffs.

William W. Porter, Judith S. Yogman, and Peter Sacks, Office of the Massachusetts Attorney General, Boston, MA, for defendants.

Joel Z. Eigerman, Esq., Boston, MA, on behalf of the Jewish Alliance for Law and Social Action, Americans United for Separation of Church and State, Citizens for Participation in Political Action, Citizens for Public Schools, The League of Women Voters of Massachusetts, The Massachusetts Federation of Teachers and the Unitarian Universalist Association of Congregation, Amicus.

### MEMORANDUM AND ORDER

OTOOLE, District Judge.

The plaintiffs have a proposal to amend the Massachusetts constitution, and they would like to make use of the initiative procedure available under that constitution to put the proposal to a vote by the State's electorate. Under the Massachusetts initiative procedure, before a question can be put to the electorate, the State's attorney general must certify that it is a proper question to be placed on the ballot. This involves determining whether certain procedural steps have been fulfilled. It also involves comparing the subject matter of the initiative proposal to a list of matters which the constitution by express provision excludes from eligibility for consideration through the initiative process.

The plaintiffs are the parents of children who attend private schools sponsored or supported by religious institutions. They favor the enactment of programs to provide direct or indirect public financial support for their educational expenses, such as by means of vouchers or scholarships. A particular provision of the Massachusetts constitution stands in the way of the adoption of such programs, however. Amendment Article 18 of the Massachusetts constitution prohibits any public financial support for private primary or secondary schools (though not private institutions of higher learning). (Amendment Article 18 is commonly referred to as the "Anti–Aid Amendment," because it forbids "aid" to private schools.) In order to permit legislative approval of a measure making available any of the programs the plaintiffs seek to have adopted, the Anti–Aid Amendment itself would have to be amended. That is what the plaintiffs seek to do by their initiative petition—amend the Anti–Aid Amendment so that the programs they advocate can be considered on their merits by the legislature, or perhaps, by the people via the initiative process.

Unfortunately for the plaintiffs and others of like mind, however, the Massachusetts constitution prohibits initiative petitions that would amend the Anti–Aid Amendment (the "Anti–Aid Exclusion"). Mass. Const. amend. art. 48, pt. 2, § 2. Moreover, the constitution prohibits initiative petitions that concern "religion, religious practices or religious institutions" (the "Religious Exclusion"). *Id.* When the plaintiffs presented their petition seeking to amend the Anti–Aid Amendment, the attorney general ruled that the subject matter of the petition precluded it from being placed on the ballot as an initiative,

citing both the "Anti–Aid Exclusion" and the "Religious Exclusion." In this suit, the plaintiffs seek a declaration that enforcement of the Anti–Aid and Religious Exclusions as to their proposed initiative petition violates the United States Constitution, and they further seek appropriate injunctive relief.

■ The plaintiffs' first argument is that the subject matter restrictions imposed by the Anti–Aid and Religious Exclusions with respect to the initiative petition process are impermissible governmental limitations on their freedom of speech. They rely heavily on cases analyzing what restrictions the government may impose on speech in various contexts.

In a nutshell, the legitimacy of governmental restrictions on speech depends to a great extent on the circumstances under which the speech occurs (or, perhaps more accurately, would occur if not for the restriction). The cases discuss a three-level hierarchy of "forums," with an ascending level of restriction permitted as one proceeds from the most open and unregulated to the least open and more properly regulated forums. First, there is the traditional public forum that is open to virtually unrestricted speech, such as a public park or a public sidewalk. Except for reasonable regulation of the "time, place or manner" of the expressive occasion, and some other qualifications not relevant here (such as "fighting words" or obscenity), the government must generally allow all comers to say what they want in such a forum. Next is the "designated" public forum, a place or means of communication where the government purposely permits public participation. An assembly hall in a municipal building, for example, may be made generally available to the public for private uses—lectures, performances, and the like. In such cases, the rules are generally the same as for "traditional" public forums.

Any limitation that is based on the content or subject matter of speech in a forum designated as a place for or means of communication must serve a compelling governmental interest and must be tailored to serve that interest without restricting speech or expression not implicating that interest. Finally, there is the "non-public" forum, a place or facility not open broadly to the public for the communication of ideas. The government may set more stringent rules for expression in a non-public forum, such as limiting expression to the specific purposes of the forum, so long as it does not favor or disfavor expression based on the public officials' approval or disapproval of the point of view of the expression. An internal communications facility in a government workplace—like teachers' mailboxes in a public school—would be an example.

The plaintiffs assert that their proposed use of the initiative procedure to present for a vote by the electorate of the Commonwealth a petition that would amend the Anti–Aid Amendment is "speech" protected by the First Amendment principles articulated in the "forum" cases. The difficulty with this theory, however, is that the presentation of a petition to the electorate is significantly more than simply the communication of ideas or viewpoints, though it certainly includes and stimulates such communication. Beyond communication, the initiative process is a functional exercise in lawmaking. By invoking the initiative process, the plaintiffs want to do more than just *say* something; they want to *do* something—achieve electoral approval of an amendment to the Massachusetts constitution. The effect of the limitations imposed by the initiative exclusions challenged here is to preclude direct popular lawmaking as to certain subject areas. Any restriction on the plaintiffs' desired "speech" through the initiative process is a necessary incident, but an incident none-

theless, of the limited availability of that process as an instrument of lawmaking.

The challenged provisions of the constitution impose no restriction on speech either in favor or against any initiative petition that is permitted. Cases analyzing restrictions on "only" speech in various forums or channels of communication—even those addressing speech specifically in support of initiative petitions, *see Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999); *Meyer v. Grant,* 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988)—are not directly pertinent to deciding the propriety of restrictions on speech that is more than just speech because it is not only meaningful, but functional.

The Massachusetts constitution established a representative, "republican" form of government, with legislative, executive and judicial branches. *See generally,* Mass. Const. pt. 2 ("The Frame of Government"). The power to make laws is granted generally to the legislative branch, *id.,* ch. 1, § 1, art. 4, which is composed of senators and representatives elected from geographically described districts. *Id.,* §§ 2 and 3. As the result of a constitutional convention held in 1917 and 1918, the constitution was amended to provide for direct popular lawmaking by way of initiative petitions (as well as for direct popular review of legislative lawmaking by way of referendums). *Id.* amend. art. 48.

However, the initiative process is not made available for direct lawmaking by the people without limitation. It may not be used to adopt laws dealing with a number of specified topics, including those at issue in this case. Some of the matters excluded from consideration by means of an initiative petition relate to the frame or organization of the government itself. So, for example, matters affecting the judicial branch may not be the subject of an initiative. Similarly, the legislature's appropri-ation power is protected by excluding measures that would make specific appropriations from the state treasury. Other exclusions prevent initiatives that would weaken or undercut particular individual rights enumerated in the constitution's declaration of rights. The constitutional article establishing the initiative may not itself be the subject of an initiative petition.

The initiative procedure can thus be seen as an exception to the general rule that lawmaking will be accomplished by the legislature. Yet in creating that exception, Amendment Article 48 also created exceptions to the exception, and for those matters the "usual," representative procedures apply. There is no reason to think that the federal Constitution requires the States to adopt an "all or nothing" initiative procedure—that is, that Massachusetts either must permit the initiative to be used for all lawmaking purposes without restriction or not permit it at all. To be fair, the plaintiffs do not suggest otherwise. Rather, they argue that the rules against content- or viewpoint-based discrimination in the "only speech" cases ought likewise to be used to limit the power of the State to close the initiative procedure to some purposes, while opening it to others.

As noted above, it is a sufficient reason not to regard those cases as controlling that the initiative's functional process of lawmaking is significantly and substantially different from a place or facility that has been opened, by tradition or designation, for the dissemination and discussion of ideas. Beyond that, the rules are unworkable as a practical matter in the initiative context because of a fundamental conflict with the proposition that the initiative procedure need not be universally available. It seems obvious that if some matters are to be permitted and others not, the de-

scription of either category would be done by reference to content or subject matter, not only as a matter of the requirements of language, but also because topical grants or prohibitions of lawmaking powers are usual and traditional. Thus, for example, like the First Amendment itself, the first section of the Anti–Aid Amendment, not here at issue, provides, "No law shall be passed prohibiting the free exercise of religion." That is a subject matter (or viewpoint) restriction on the lawmaking power. So at least some topical exclusions must be okay. Are others not? And if one is and another is not, what standards could be used for judging which is which?

Rules of decision cognate to those in the speech cases would not be useful. To the extent that those rules would prohibit exclusion based on the content or subject matter of the proposed initiative petition, they would be inconsistent with the necessary principle just discussed—defining the scope of the initiative procedure by reference to the subject matter of proposed petitions. An attempt to refocus the test from "content" discrimination to "viewpoint" discrimination would also be unsuccessful because for purposes of defining what kinds of petitions are excluded there is not necessarily much difference between a broad definition (of subject matter) and a narrow one (of viewpoint). For instance, the exclusion that bars consideration of a petition that would abolish the right to jury trial could easily be thought of either as an exclusion based on the content or subject matter of the petition (the abolition of the right to jury trial) or as one based on its viewpoint (that the right to jury trial should be abolished).

 Another theory that better suits prophylaxis against mischief in the classification of approved and disapproved topics for petitions is one drawn from equal protection doctrine, which is an alternate basis proposed by the plaintiffs for the relief they seek. But while the possibility seems more congenial at first blush, in the end that theory likewise must be rejected.

The plaintiffs rely mainly on two cases, *Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969) and *Washington v. Seattle School Dist.*, 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982), for support for their proposition that "distortions of the political structure that impose a hurdle on one group seeking legislation in the political process that is not similarly imposed on other groups constitutes a denial of equal protection." Pls.' Mem. in Supp. of Mot. for Summ. J. at 37. The quoted language from the plaintiffs' brief somewhat overstates the holdings of the cases cited. In both cases, the Supreme Court struck down measures that made it more difficult for a racial minority to achieve the enactment of beneficial legislation than it was for sponsors of other legislation generally. Since the measures impacted a racial minority, the classification was deemed "suspect" under conventional equal protection theory and thus subject to "strict scrutiny." The plaintiffs cannot successfully argue that Anti–Aid and Religious Exclusions, individually or in tandem, operate to "classify" the plaintiffs by reference to their religious beliefs or practices (a classification that, if it occurred, would be "suspect"). The plaintiffs are the parents of children attending private schools operated under the auspices of religious institutions. According to the amended complaint, although all the named plaintiffs have enrolled their children in Catholic parochial schools, not all the plaintiffs are Catholics themselves. To the extent they have a group identity, it is not defined by membership in a particular religious faith, but rather in the shared faith in the educational opportunities offered by Catholic and other religious-sponsored schools. At the risk of stating the obvious, other members of the same reli-

gious faiths as the plaintiffs do not share the plaintiffs' interest in private schooling for their children and instead enroll them in public schools.

Another trigger for strict scrutiny under equal protection theory is when the challenged governmental action has the effect of impermissibly "burdening" a "fundamental right." But there is no such burdening here because the plaintiffs have not identified a fundamental right that has been harmed by the Anti–Aid and Religious Exclusions. In particular, the exclusions from the initiative process that the plaintiffs complain of do not implicate the plaintiffs' opportunity to vote on any matter that does appear on the ballot, but rather their opportunity to have a question placed on the ballot in the first place. That interest is not the same as the "right to vote" that is recognized in case law as a "fundamental right." And as noted earlier, there is no recognized federal constitutional "fundamental right" to have a matter accepted by a State for inclusion in the initiative process of lawmaking.

Nor is the plaintiffs' fundamental right to practice their chosen religion affected by the exclusions. The exclusions have nothing to do with the practice of religion, even if that could be broadly understood as including the enrollment of children in religious-sponsored schools. The exclusions pertain to the initiative ballot, not to school choices.

■ Another equal protection case cited by the plaintiffs is *Romer v. Evans*, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). In that case, the Supreme Court concluded that a state constitutional provision that prohibited the enactment, either at the state or local level, of measures regulating discrimination against persons on the basis of sexual orientation placed an obstacle in the path of homosexuals that did not exist for persons seeking other legislation. *Id.* at 627, 116 S.Ct. 1620.

The Court concluded that the distinction lacked a rational basis, so that even though there was neither a suspect classification nor a fundamental right at stake, the constitutional provision at issue violated equal protection principles.

It is difficult to extrapolate a principle from *Romer* that might serve as a basis for granting similar relief to the plaintiffs. One difference between the cases that seems significant is that in *Romer* the obstacle placed in the way of supporters of possible anti-discrimination legislation was that they were required to amend the state constitution to eliminate the prohibition against such legislation, rather than simply succeeding at the task of obtaining enactment of such legislation, either at the state or local level. That problem may be like the one the plaintiffs face in attempting to obtain the enactment of some sort of public financial aid to persons like themselves who have children enrolled in private religious schools, because in order to have such legislative proposals enacted, they must first by constitutional amendment eliminate the Anti–Aid Amendment's prohibition of such support. But what is at issue now is not the constitutional validity of the Anti–Aid Amendment itself. This Court has previously ruled that the plaintiffs lack standing to make that challenge. Rather, what is at issue at this stage are only the Anti–Aid and Religious Exclusions to the initiative procedure. Those provisions do not change the level at which desired legislation may be enacted; they simply foreclose use of the initiative procedure to amend the Anti–Aid Amendment. By operation of the exclusions, the plaintiffs must avail themselves of the other process provided for amending the constitution, through the legislature. With or without resort to the initiative, the plaintiffs still must achieve amendment of the constitution.

Nevertheless, assuming in the plaintiffs' favor that *Romer* would require Massachusetts to justify the exclusions under the "rational basis" test, they easily pass that test. As the record of the debates of the Massachusetts Constitutional Convention of 1917—1918 indicate, the adoption and contours of the initiative and referendum provisions of the constitution were resolved after extended discussion and compromise. They reflect the majority consensus that the initiative and referendum should not be available without limitation for lawmaking on any and all topics, and specifically that the initiative should not be available for all proposals to amend the constitution, including the newly amended Anti–Aid Amendment. These exclusions reflect an evident judgment that some questions are better resolved in a process that permits extended debate and compromise than in a process that essentially puts a fixed proposition to the general electorate for a single up or down vote. The wisdom and prudence of the exclusions are a matter on which opinion could reasonably be divided, but it cannot be said that insisting that certain subjects are better addressed in the traditional way of representative government before they are put on the state-wide ballot is an irrational idea.

█ The plaintiffs make the additional argument that the Religious Exclusion violates the Free Exercise Clause of the First Amendment by placing a hurdle in front of those who want to propose initiative petitions that deal with "religion, religious practices, or religious institutions" that is not placed in front of persons seeking to propose other initiative matters. The argument lacks merit, substantially for the reasons put forward by the defendants. As noted above, the exclusions bear on the plaintiffs' ability to invoke the initiative process, not on their exercise of religion. Recently, the Supreme Court held that the refusal of the State to subsidize religious studies does not violate the Free Exercise Clause. *See Locke v. Davey,* —— U.S. ——, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004). It surely follows that it is not a violation of that Clause for the State to limit consideration of the question whether to subsidize or not to the established representative process, rather than the initiative process.

In any event, the Religious Exclusion does not burden the plaintiffs (or religious people generally) differently from other citizens. It equally precludes both proposals that would be friendly to religion or religious institutions, such as proposals the plaintiffs might make, and proposals that would be hostile to religion. Put another way, the exclusion keeps from the initiative process both proposals tending to inhibit the free exercise as well as proposals tending to forestall any establishment of religion, in a way that is just as balanced and neutrally phrased as is the First Amendment itself.

The plaintiffs' spirited and thoughtful attack on the initiative exclusions is in the end unavailing. The plaintiffs' motion for summary judgment in their favor is DENIED, and the defendants' cross-motion for summary judgment is GRANTED.

A declaratory judgment shall enter that the Anti–Aid and Religious Exclusions contained in Amendment Article 48 to the Massachusetts constitution are not invalid as violative of the First and Fourteenth Amendments to the United States Constitution. Judgment shall enter in favor of the defendants under all counts of the amended complaint.

It is SO ORDERED.