LUCERO, Circuit Judge,
concurring in part and dissenting in part.
I am pleased to join Parts I & II of Judge McConnell’s opinion on the issues of standing and ripeness. I cannot, however, join the conclusion of my respected colleagues as to the merits, as expressed in Part III. Because today’s decision frees from constitutional scrutiny conduct by a majority of voters that has the potential to chill political speech on the basis of content by imposing discriminatory election requirements; because the decision falls on the wrong side of a circuit split; and because the decision offends traditional notions of governance by the people, I respectfully dissent.
Assuredly, a state may adopt a constitutional amendment barring the passage of any law affecting an issue. But it may not rig election laws by imposing a content-based two-thirds majority requirement— or greater, as today’s decision would allow — without implicating the First Amendment and subjecting such conduct to judicial review. Because participating in an election and engaging in election-related speech are effectively part of the same course of conduct, election laws that discriminate against a minority’s views implicate fundamental rights enshrined in the First Amendment.
The constitutional amendment at issue, “the Wildlife Amendment,” passed by a bare majority of Utah voters, provides that initiatives “to allow, limit, or prohibit the taking of wildlife or the season for or method of taking wildlife shall be adopted upon approval of two-thirds of those voting.” Utah Const, art. VI, § l(2)(a)(ii). Those favoring the status quo on wildlife issues were able to pass this amendment because they are, at least as of the time of passage, a majority of Utah voters. By passing this constitutional amendment, the current majority has enshrined its present views into perpetuity. Now, regardless of whether a future majority — even a 66% majority — of the population supports a change in wildlife laws, such future majority will be unable to use the initiative process to enact its preferences into law. Further, the two-thirds requirement will chill any attempt to change the law, as any such campaign will be futile. As stated in a report prepared by the Utah Division of Wildlife Resources, the amendment “make[s] it virtually impossible for the citizens of Utah to mount a successful ballot initiative affecting wildlife management practices.” One scholar has described this as a problem of “intertemporal entrenchment.” Michael Klarman, Majoritarian Judicial Review, 85 Geo. L.J. 491, 517 (1997).
What we confront in this case is substantively indistinct from what occurs when a political party currently in power draws district lines for legislative seats to their own advantage. In that situation— commonly referred to as partisan gerrymandering — a current majority party draws district lines to virtually guarantee its majority against huge sways in popular opinion. See Vieth v. Jubelirer, 541 U.S. 267, 345-46, 124 S.Ct. 1769, 158 L.Ed.2d *1111 546 (2004) (Souter, J., dissenting) (collecting scholarly work showing how gerrymandering can frustrate the popular will). “Gerrymandering and other manipulations of electoral laws enable small, transient majorities to leverage themselves into more enduring ones.” Richard Pildes, Constitutionalizing Democratic Politics, 118 Harv. L.Rev. 28, 60 (2004) (emphasis added). Gerrymandering not only affects who wins elections, it chills any challenge to the majority. See Samuel Issacharoff, Gerrymandering and Political Cartels, 116 Harv. L.Rev. 593, 625 (2002) (nearly half of all seats in state legislatures are unopposed because gerrymandering renders them “so safe as not to generate any serious challenge.”). Such gerrymandering is at least allowed an open season every ten years; not so the present amendment.
What a majority of the voters in Utah have done in this case and what a legislature engaged in partisan gerrymandering does is identical. A current majority enshrines its gains in law against sways in popular opinion and does so through election laws designed to channel results and to squelch dissent.
In Vieth, the Supreme Court faced a challenge under the Equal Protection Clause to a partisan gerrymander in Pennsylvania. Four Justices joined a plurality opinion holding that there were “no judicially discernible and manageable standards for adjudicating political gerrymandering claims” and hence “political gerrymandering claims are nonjusticia-ble.” Vieth, 541 U.S. at 281, 124 S.Ct. 1769. Four dissenters argued that there were manageable standards that would render Pennsylvania’s .gerrymander unconstitutional. Standing in the middle of this dispute, and holding the swing vote, was Justice Kennedy, who wrote a concurring opinion stating that, although there was no current standard for determining the constitutionality of gerrymanders, one might develop. As such, the prudent decision was to wait for lower courts or litigants to develop such an approach and not bar partisan gerrymandering suits permanently. Id. at 311, 124 S.Ct. 1769 (Kennedy, J., concurring)
Justice Kennedy argued that the approaches advanced by the dissenters as well as the litigants in the case were flawed because they were rooted in the wrong source of law — the Equal Protection Clause. Such analysis would always push the court to the political question of whether the 'partisan purpose had been excessive. Id.[1]
Despite the inapplicability of the Equal Protection Clause to partisan gerrymandering cases, Justice Kennedy would hold that the First Amendment provides the proper source of protection for political minorities. Justice Kennedy writes: “The First Amendment may be the more relevant constitutional provision in future cases that allege unconstitutional partisan gerrymandering.” Id. at 317, 124 S.Ct. 1769. He reasons that cases involving partisan manipulation of electoral laws “involve the First Amendment interest of not burdening or penalizing citizens because of their participation in the electoral process ... or their expression of -political views.” Id. at 314, 124 S.Ct. 1769. In the present case, a majority of Utahns passed the Wildlife Amendment to defeat wildlife legislation favored by “local animal extremists” and “to preserve Utah’s wildlife practices from East Coast Special Interest groups” who planned to press “the Washington DC agenda” through the initiative process. The current majority in Utah chose to burden “citizens because of their participation in the electoral process [and] their expression of political views,” impli- *1112 eating precisely the First Amendment interests identified by Justice Kennedy. Id. (“First Amendment concerns arise where a State enacts a law that has the purpose and effect of subjecting a group of voters ... to disfavored treatment by reason of their views.”).
Justice Kennedy does not explain exactly how the First Amendment should be used to analyze partisan gerrymandering claims. That task is left to litigants and lower courts. He did, however, explain the contours of such an analysis: “If a court were to find that a State did impose burdens and restrictions on groups or persons by reason of their views, there would likely be a First Amendment violation, unless the State shows some compelling interest.” Id.
Instead of following Justice Kennedy’s suggestion that lower courts fashion a manageable First Amendment standard, the majority opinion chooses to cast aside Supreme Court guidance on the matter and free such super-majority impositions, be they 66.67% or 99%, from all future constitutional scrutiny. In my judgment, a better approach would be to follow the First Circuit’s decision in Wirzburger v. Galvin, 412 F.3d 271 (1st Cir.2005). Wirz-burger stands for the proposition that laws that bias electoral results also may unconstitutionally chill election-related speech. The Massachusetts Constitution permits initiatives to amend the state constitution, but specifically bars initiatives implicating public funding of private education. Id. at 274; Mass. Const, amend, art. 48. Citizens who sought to pass such an amendment by initiative challenged the bar on First Amendment grounds.
Although acknowledging that the main purpose of the initiative ban was to regulate the passage of laws, not to regulate speech, the Wirzburger court recognizes that the “state initiative process provides a uniquely provocative and effective method of spurring public debate ....” Id. at 276. Discriminatory election regulations not only dictate outcomes — they also chill speech. The issue is not, as the majority in this case mischaracterizes it, whether the regulation makes “expression less persuasive or less likely to produce results.” Maj. Op. at 1102. Instead, the question is whether participation in an election has both speech and non-speech elements. Like Justice Kennedy in Vieth, the First Circuit reasons in Wirzburger that initiative elections are so suffused with speech that any attempt to control the outcome of an election affects the speech rights of those competing in the election. Given that election campaigns are necessarily conducted through the medium of speech, it is no more than foolhardy formalism to say that election laws that rig the outcome of elections do not infringe on speech rights. In America, at least, one cannot silently campaign — supporting an initiative requires speech.
This does not mean that a state constitutional amendment barring all legislation to change the status of wildlife law would be subject to a First Amendment challenge. Such outright bans on the passage of law are distinct from election laws, because the former establishes a substantive ban whereas the latter regulates conduct containing speech and non-speech elements. States do not offend the First Amendment when they enact substantive limits on the types of laws that can be passed. When, however, states stack the deck by writing electoral laws that produce a given outcome, First Amendment concerns arise because the speech of those who want to campaign to change the laws is directly limited.
The Massachusetts regulation at issue in Wirzburger operates like other bans on expressive conduct — action that contains both speech and non-speech components— *1113 that the Supreme Court has chosen to review. See, e.g., United States v. O’Brien, 391 U.S. 367, 382, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (law banning the destruction of draft cards can be challenged under the First Amendment). Regulations governing expressive conduct are subject to intermediate scrutiny. O’Brien, 391 U.S. at 382, 88 S.Ct. 1673. As such, “conduct combining ‘speech’ and ‘non-speech’ elements can be regulated if four requirements are met: (1) the regulation ‘is within the constitutional power of the Government;’ (2) ‘it furthers an important or substantial governmental interest;’ (3) ‘the governmental interest is unrelated to the suppression of free expression;’ and (4) ‘the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.’ ” Wirzburger, 412 F.3d at 279 (quoting O’Brien, 391 U.S. at 377, 88 S.Ct. 1673.).
In following this test, courts require states to present reasons for their electoral regulations. As is made clear in O’Brien and in Wirzburger, a state cannot justify an election regulation on the basis that it reflects an intent to help or punish a particular group. Rather, the reasons must be structural — that certain issues are, perhaps because of them complexity, not suitable for the initiative process, or that protecting minority interests, in some cases, requires a broader consensus than that of a simple majority. If a state’s justification is important or substantial, and the restriction is no greater than essential to fulfill that interest, then the state’s law is determined not to violate the First Amendment.[2]
This is not unlike the role courts fulfill in most election law cases. When deciding a challenge to laws affecting a political party’s First Amendment right of association, we “weigh the character and magnitude of the burden the State’s rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State’s concerns make the burden necessary.” Timmons v. Twin Cities Area Netv Party, 520 U.S. 351, 355, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (holding that state interests in stability and the two-party system justified a state law barring any one candidate from appearing on two different party ballots even though the law limited a party’s First Amendment rights). See also Clingman v. Beaver, 544 U.S. 581, 125 S.Ct. 2029, 2038, 161 L.Ed.2d 920 (2005) (state interest in maintaining independent and viable political parties justifies state law barring a party from inviting to vote in their primary members of other parties); California Democratic Party v. Jones, 530 U.S. 567, 574, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000) (finding a state-mandated “blanket primary” unconstitutional because state interest in promoting moderate candidates does not justify a limitation of a political party’s free association rights).
Unlike right of association cases, a court adjudicating a free expression election case under O’Brien does not weigh competing interests. If the government’s interest is important and the law is tailored to achieving that interest, that ends the analysis. *1114 The majority opinion suggests that there is something extraordinary about a court deciding whether an interest in this context is important or substantial. This ignores the fact that courts routinely make more difficult judgments in most election law cases.
Courts not only can make such determinations, they must. As in the present case, such laws cut to the very structure of our democracy. Rather than being the worst place for judicial intervention, this is where it is most essential. In most constitutional cases, courts face what is often referred to as the “counter-majoritarian difficulty.” Alexander M. Bickel, The Least Dangerous Branch 16-23 (1962). We, unelected federal judges, interpret the Constitution to determine whether the pre-commitment strategy of the Founders invalidates the choices of current electoral majorities.[3] The “counter-majoritarian difficulty” goes directly to our legitimacy in a constitutional system. This case does not present such question about our legitimacy — when we review efforts by those currently in power to entrench themselves, we are pro-majoritarian in that we are questioning laws that may have an antidemocratic effect. See Klarman, 85 Geo. L.J. at 497-98. Those who aspire to become the majorities of tomorrow, but are discriminated against today, have no recourse other than the courts. Future majorities that spring from today’s unpopular opinions should not be strangled by the dead hands of the past. Because today’s decision places a garrote in those very hands, I respectfully dissent.

. Appellants in the case at bar chose not to advance an Equal Protection challenge.

. Using O'Brien's intermediate scrutiny test is consistent with Justice Kennedy's admonition that “courts must be cautious about adopting a standard that turns on whether the partisan interests in the redistricting process were excessive. Excessiveness is not easily determined.” Vieth, 541 U.S. at 315, 124 S.Ct. 1769 (Kennedy, J., concurring). Applying O’Brien in this context does not require us to decide whether partisan interests are excessive; we only ask whether the state has an important, non-speech restricting interest in the law and whether the restriction of speech rights is no greater than necessary to further that interest.

. That Utah’s constitutional amendment would have offended the Founders vision of democracy cannot be questioned. One of the Fathers' cardinal concerns was that democratic government not lead to tyrannical rule by a majority over a minority. “When a majority is included in a faction, the form of popular government ... enables it to sacrifice to its ruling passion or interest both the public good and the rights of other citizens.” The Federalist No. 10, at 106 (J. Madison) (Hamilton ed. 1868). The Founders did not think the problem of majority abuse of minorities was limited to those in government: they were particularly worried about the ways in which a majority of the people could impose their will impose on a minority. "The prescriptions in favor of liberty, ought to be levelled against that quarter where the greatest danger lies, namely, that which possesses the highest prerogative of power: But this is not found in either the executive or legislative departments of government, but in the body of the people, operating by the majority against the minority.” James Madison, Speech of James Madison to House of Representatives (June 8, 1789) in Daniel A. Farber & Suzanna Sherry, A History of the American Constitution 227, 229 (1990).
James Madison responded to this problem by arguing that a large democracy contained within it the antidote to majority tyranny: shifting alliances among factions that would serve to ensure that no one faction dominated over time. "Extend the sphere, and you take in a greater variety of parties and interests; you make it less probable that a majority of the whole will have a common motive to invade the rights of other citizens; or if such a common motive exists, it will be more difficult for all who feel it to discover their own strength, and to act in unison with each other.” Id. A large democracy poses "greater obstacles ... to the concert and accomplishment of the secret wishes of an unjust and interested majority.” Id. In Utah, proponents of the status quo on wildlife issues found a way to circumvent Madison's prescription for escaping majority tyranny. They immortalized their majority in the state's election laws. Therefore, their current majority is not subject to the shifting winds of public opinion.